Eugene SEVERSON, Appellee,

v.

ELBERON ELEVATOR, INC., Appellant.

No. 2–57585.

Supreme Court of Iowa.

Feb. 16, 1977.

Leo E. Gross and Harry Bookey, of Thoma, Schoenthal, Davis, Hockenberg & Wine, Des Moines, for appellant.

Harold J. Swailes, of Belle Plaine, and Keith Mossman, Vinton, for appellee.

Heard by REYNOLDSON, Acting C. J., and MASON, LeGRAND, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

The trial court sustained plaintiff's petition for specific performance of an oral contract to purchase the physical assets of defendant's grain elevator. The main question on appeal is the sufficiency of evidence to support the court's decree. We affirm the trial court.

Plaintiff Eugene Severson was at all material times general manager and part owner of Froning Grain Company, a corporation which owned and operated several Iowa country grain elevators. Defendant Elberon Elevator, Inc., was at all material times owner and operator of a country elevator at Elberon in Tama County. Robert C. Blythe and Larry F. Mosebach were the sole shareholders of defendant. Mosebach, who headed a C.P.A. firm with offices in Tama and several other cities, was defendant's president and secretary. He had tried to sell the financially troubled elevator for several years prior to meeting with Severson at the elevator premises on Sunday, March 4, 1973.

Severson had inspected the elevator in 1970 or 1971 and subsequently discussed purchase with Mosebach, but negotiations broke off because they could not agree on a price. Then in the fall of 1972 Mosebach contacted him again, but Severson was not interested in discussing purchase at the quoted selling price.

The March 4, 1973, meeting was initiated by Mosebach who called Severson several days earlier to tell him the asking price had been reduced to $75,000. It is undisputed that this price was for purchase of defendant's corporate stock. A. J. Froning, president of Froning Grain Company, accompanied Severson to the March meeting.

The three men walked through the elevator facilities and Severson examined them. The physical assets of the elevator on that date included a parcel of land leased from a railroad, a parcel of land owned by defendant, one 100,000 bushel capacity steel building, one frame elevator with 10,000 bushel capacity and appurtenant storage structures, a feed mill, one frame elevator with 20,000 bushel capacity with a dryer, an office building, two storage buildings, twenty 3200 bushel steel bins, inventory of feed and fertilizer, several vehicles, and miscellaneous equipment.

In asking $75,000 for defendant's corporate sock, Mosebach was attributing substantial value to an operating loss carryforward tax adjustment available to defendant as well as to the physical assets.

The parties agree they spent much of the afternoon of March 4 in negotiations. They also agree they ultimately arrived at a value of $50,000 for the physical assets of the elevator, exclusive of inventory. Moreover, they agree Severson gave Mosebach a $5,000 check as earnest money. However, they differ on whether a binding contract of sale resulted.

Severson contends the parties agreed on all necessary terms and entered an oral contract whereby he was to purchase the physical assets of defendant, exclusive of inventory, for $50,000. He maintains a written document was to be prepared merely as a memorial of the contract. Defendant contends that while the parties agreed on a value to be placed on the physical assets, exclusive of inventory, they did not settle on other essential contract terms and contemplated further negotiations culminating in a written contract.

In our *de novo* review, we must decide (1) whether Severson proved the terms of the alleged oral contract, (2) if so, whether the

parties intended to be bound by it, (3) whether Severson subsequently rescinded or abandoned the contract, (4) whether he proved he did not have an adequate remedy at law, (5) whether the trial court erred in making incomplete findings of fact, and (6) whether the court erred in reducing the purchase price by the full amount of an insurance settlement for assets destroyed by fire on March 5, 1973.

Even though our review is *de novo*, we accord weight to trial court findings of fact, especially when the credibility of witnesses is involved.

I. *Terms of the alleged oral contract.* When the terms of an agreement are definitely fixed so that nothing remains except to reduce them to writing, an oral contract will be upheld unless the parties intended not to be bound until the agreement was reduced to writing. *Marti v. Ludeking,* 193 Iowa 500, 503–504, 185 N.W. 476, 477–478 (1921). The terms are sufficiently definite if the court can determine with reasonable certainty the duty of each party and the conditions relative to performance. *Janssen v. North Iowa Conference Pensions, Inc.,* 166 N.W.2d 901, 907 (Iowa 1969).

Because Severson asked specific performance of an agreement affecting real estate, he had the burden to prove the contract by a preponderance of clear, satisfactory and convincing evidence. *McCarter v. Uban,* 166 N.W.2d 910, 912 (Iowa 1969).

We believe he met his burden to prove the terms of the agreement.

We find the following contract terms were established. Severson was to pay defendant $50,000 for the physical assets of defendant exclusive of inventory. Defendant's stock was not included. An April 1, 1973, date of possession was agreed on, but was not of the essence of the agreement. Defendant assured Severson existing insurance coverage of the assets was adequate and agreed to maintain it until transfer of possession. Property taxes were to be apportioned. Defendant promised to comply with the bulk sales law. Defendant was to show marketable title and transfer the real estate by warranty deed and assign its lease with the railroad. Mosebach was to terminate the employment of the elevator manager, while other employees were to be retained. Severson was to handle movement of such grain as remained in the elevator as of possession date, upon request of defendant, in consideration of customary charges for that service. Defendant was to retain and carry out its own obligations on warehouse receipts and grain contracts. Severson paid defendant $5,000 to bind the bargain. He noted on his check that it represented ten percent earnest money on a $50,000 "purchase price."

Defendant admits several of these terms were agreed upon but denies others. It also argues that a prudent businessman would have insisted on additional and more precise terms, especially relating to handling of the grain. We agree that prudent businessmen might well have acted more wisely than the parties to this transaction. Indeed, this litigation could have been avoided if they had entered the kind of written contract defendant now asserts was then contemplated. However, our decision must be based on what the parties did in fact, not on whether they acted prudently.

Several items which defendant contends were essential elements of a valid contract but were not agreed upon are actually not essential contract elements but are either optional or matters of implementation. For example, Severson had previously ascertained the willingness of the railroad to permit assignment of the lease and had done the groundwork for obtaining financing. The existence of a valid contract was not dependent on the railroad's execution of written consent to the lease assignment or on Severson completing his financing arrangements.

Mosebach was intimately familiar with what he had to sell and what he had to do to sell it. He knew the elevator business, was a successful C.P.A., and was sophisticated in business matters. Defendant's license was in jeopardy and its finances

were precarious. Mosebach obviously wished to cut his losses by disposing quickly of at least the physical assets of the business.

The record shows that when the parties reached tentative agreement Mosebach telephoned Blythe, informed him of the terms of the transaction, discussed them with him, and then said to Severson, "Well, you have just bought an elevator." The record also shows, through testimony of the former elevator manager, that Mosebach that evening notified the manager of the sale and told him he would not be employed by the new owner.

While we recognize a prudent businessman might have demanded additional terms and that the terms be spelled out with more precision, the persons involved in these negotiations were skilled, experienced businessmen and fully understood the implications of what they agreed upon. Neither party had any advantage over the other. We think the terms were sufficiently complete and specific when given those reasonable interpretations that ordinary businessmen are willing to give and considering the surrounding circumstances. See 5A Corbin on Contracts § 1174 at 279 (1964).

We find that the terms of the contract were established with reasonable certainty.

■ II. *Contemplation of a written document.* This same evidence satisfactorily answers the second issue. Although defendant contends the transaction of March 4 consisted only of preliminary negotiations, we believe the record shows the parties made an oral contract by which they intended to be bound.

■ Whether preliminary negotiations actually ripened into an oral contract depends on the intention of the parties as gleaned from the facts of the case. *Alpen v. Chapman,* 179 N.W.2d 585, 589 (Iowa 1970). Moreover, an oral contract may exist even though the parties intend to reduce it to writing at a later date. This principle is expressed in Restatement (Second) of Contracts § 26 (Tent. drafts 1–7 Student Ed. 1973):

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

■ Factors to be considered in seeking to ascertain whether the parties intended to be bound prior to execution of a written document include whether the contract is of a class usually found to be in writing, whether it is of a type needing a formal writing for its full expression, whether it has few or many details, whether the amount is large or small, whether the contract is common or unusual, whether all details have been agreed upon or some remain unresolved, and whether the negotiations show a writing was discussed or contemplated. *Emmons v. Ingebretson,* 279 F.Supp. 558, 572 (N.D.Ia.1968). Resolution of the issue in the present case is difficult. In the final analysis it depends on which version of the negotiations of March 4 is believed. Because we find Severson's evidence more credible, we conclude that the parties intended to be bound prior to execution of a written document and intended the subsequent document to be a memorial of their oral contract.

III. *Rescission, abandonment and estoppel.* Defendant contends that even if the parties had a binding contract on March 4, Severson thereafter rescinded or abandoned it or conducted himself so inconsistently with the existence of a valid contract as to be estopped from asserting any rights under it.

■ We have long recognized that parties to a valid contract may rescind or abandon it, or substitute another in its place, or by conduct inconsistent with the continued existence of the original contract estop themselves from asserting any right thereunder. *Morse v. Slocum,* 192 Iowa 1080, 1094, 186 N.W. 22, 28 (1922). The burden of establishing that one of these events occurred is on the party raising such claim. It may be evidenced by both words

and conduct. When the evidence is susceptible to differing inferences, the issue whether the claim has been proven is for the trier of fact. *Siebring Manufacturing Co. v. Carlson Hybrid Corn Co.,* 246 Iowa 923, 70 N.W.2d 149 (1955).

In the present case, the issue arises because of events which began on March 5, 1973, the day after the parties' oral contract. On that date a fire at the elevator destroyed some of defendant's assets and some stored grain. Severson and Mosebach discussed whether the sale should proceed on schedule with the added provision that Severson make the insurance claims for the portion of purchased assets destroyed in the fire or whether conveyances should be delayed while defendant made those claims and recoveries, with appropriate adjustment in the purchase price. Because the insurance also covered property which was not sold, the parties concluded implementation of the contract should be delayed and defendant should make the insurance claims and recoveries. They agreed that Severson would receive the benefit of insurance proceeds allocable to purchased assets.

Defendant negotiated with its insurer through the summer of 1973. During the same period, with some help from Severson, it loaded out all stored grain and attempted to dispose of its inventory. Also, its warehouse license was revoked on the basis of grain shortages. Severson met with Mosebach or James Gehling, a member of Mosebach's C.P.A. firm who was handling elevator affairs, on several occasions during the summer to discuss the possibility of purchasing the corporate stock. Considerable attention was given by Gehling to fixing a value on the operating loss tax characteristics of defendant.

However, on August 3, 1973, Severson's lawyer wrote defendant demanding that the oral contract of March 4 be carried out. His letter included the following:

As you know an oral agreement was entered into by the parties on or about the 4th day of March, 1973, in connection with which oral agreement $5,000 was paid down by the buyer and was received by you. Subsequently, there was damage to some of the facilities and equipment being sold which facilities and equipment were covered by insurance. It is our understanding that the insurance settlement has now been made by you with the insurance company and that you have retained the insurance proceeds.

Our client wishes to carry out the contract, but wants to receive from you either the full insurance proceeds for damages to the facilities and equipment which were the subject of the sale, or in the alternative, demands a reduction of the purchase price by the amount of the insurance proceeds received.

On August 29, 1973, Gehling wrote Severson, notifying him the insurance matters had been settled except for a claim against defendant by the railroad for damage to a railroad car. Gehling said defendant would probably lose its insurance in another 30 days and suggested Severson might purchase defendant's remaining inventory.

Defendant was to receive insurance proceeds of $35,000 allocable to assets included in its contract with Severson. The final settlement check was not received until October or November. In the meantime, the parties discussed the possibility of a lease of the premises by Severson which would enable him to insure the property and receive fall grain. Those negotiations broke off, in part because defendant desired a provision in the lease by which Severson would release it from any obligation under the March 4 contract.

On December 6, 1973, Mosebach sent Severson a $5,000 check, representing it to be the return of the amount which Mosebach said Severson had tendered as earnest money toward the prospective purchase of defendant's common stock. Severson refused to accept it.

This is the course of conduct relied on by defendant in contending Severson rescinded or abandoned the contract or should be estopped from asserting rights under it.

The August 3 letter, retention by defendant until December of the $5,000 downpayment, and refusal of Severson to release his

rights under the March 4 contract in the proposed lease, are persuasive evidence that Severson continued throughout his negotiations with defendant to assert the validity of the oral contract. See *Storck v. Pascoe,* 247 Iowa 54, 72 N.W.2d 467 (1955).

It is clear, as the trial court found, that the parties modified their original contract after the fire to delay its implementation and to substitute an allocation of insurance proceeds for the purchased assets destroyed by the fire. However, although Severson's subsequent conduct was sometimes equivocal, we do not think he manifested an intention to rescind or abandon the March 4 contract or conducted himself so inconsistently that he is estopped from asserting his rights under it.

IV. *Adequacy of a remedy at law.* Defendant alleges Severson failed to meet his burden to show he did not have an adequate remedy at law. This allegation is premised on the theory that specific performance will not be decreed when compensation in damages will provide adequate relief. See *Robinson v. Luther,* 134 Iowa 463, 109 N.W. 775 (1906).

Specific performance is available when the contract involves property which is unique or possesses special value, i. e., *pretium affectionis.* Real estate is assumed to possess the necessary quality. *Dee v. Collins,* 235 Iowa 22, 24, 15 N.W.2d 883, 885 (1944) ("Courts assume that money damages do not constitute an adequate remedy for the breach of a real estate contract and grant specific performance without an actual showing of inadequacy of the legal remedy."). This assumption and the reasons which underlie it show the inadequacy of a remedy at law in the present case.

Real estate was included in and was an integral part of the purchase. A leasehold interest was also involved. The nature of the assets as a whole and the purpose of the purchase are also significant. These assets were uniquely suited to the operation of a country grain elevator business where they were situated and Severson's purpose was to use them in that location. They had value to him there which similar assets in a different location would not.

Defendant's financial straits are also a factor to be considered in determining the adequacy of a remedy in damages. 5A Corbin on Contracts § 1142 at 122–123 (1973).

We find this was an appropriate case for specific performance.

V. *Sufficiency of trial court findings of fact.* Defendant complains that the trial court's findings of fact are incomplete. This complaint is based on the same arguments urged by defendant in asserting plaintiff did not prove the elements of a valid contract with sufficient certainty. Our response to those arguments is equally applicable here.

Some of the matters suggested by defendant are not terms which are essential to a valid contract and were not part of the agreement here.

Moreover, defendant did not seek enlargement of the trial court's findings of fact under rule 179(b), Rules of Civil Procedure. See *Farmers Insurance Group v. Merryweather,* 214 N.W.2d 184, 190 (Iowa 1974).

In any event, we do not perceive merit in defendant's contention that the decree of specific performance must be reversed because based on incomplete findings of fact.

VI. *Reduction of the insurance proceeds offset.* The trial court credited Severson with a $35,000 offset against the $50,000 purchase price because the evidence showed that to be the amount of insurance proceeds allocable to purchased assets destroyed in the fire. Defendant asserts deduction should have been made from this offset for expenses of collecting it, grain storage expenses which Severson would have incurred if he had to segregate defendant's grain upon April 1, 1973, possession, and contingent liabilities on grain contracts of defendant which might have been avoided if the transaction had been completed on schedule.

Passing the issue whether one or more of these deductions would otherwise have been appropriate, no evidence was offered to establish the amount of any of them with sufficient certainty to permit the trial court to reduce the offset as urged.

We find no reversible error.

AFFIRMED.